Barshay v. Naithani Good morning, Your Honors. May it please the Court, Gregory A. Sioris for the Plaintiff-Appellant, Jan Barshay. This case involves a dismissal based on 12B6 of my client's Second Amendment complaint where he's seeking $250,000 from the defendant. The primary basis for the appeal centers on two releases. The general release deals entirely with employment matters and it's dated October 4th, 2019. It contains 12 pages and makes the recitals all about employment and it also states that it is the complete agreement, complete understanding, which replaces any other agreements. There's a second 6-9 release, which the judge found to be dated October 10th, even though the Second Amendment complaint, my client says they were executed contemporaneously at the closing of the sale of his employer, a company known as Medline, LLC. And the first issue is the judge... Well, it bears the date of October 10th. And if you see a judge, you'll see a different typeface on the date and a different typeface on the right. Yeah, I don't know who put the date in. I would expect it to be a different typeface if Mr. Barshay put it in, right? He didn't put it in. Well, is there an allegation to that effect? Well, the allegation is that they were both signed contemporaneously on October 4th, 2019. And also, if you look at the general release, especially Exhibit D to it, and as all the employees were terminated on that date, paragraph 2 of the general release even states it as, quote, the separation date. So as of October 10th, he wasn't an employee and the companies and the entities had been sold. Yeah, so doesn't all of the things that you've been saying so far makes it sound as if there is the release that's part of the first release that is all about employment, it talks about everything to do with employment, it says it's the only and complete and integrated argument about employment. Doesn't that all suggest that this second release is about something else? No. No. Because they were signed contemporaneously at the closing. And if you see, if you read the first release... Is your argument that the release, as opposed to the general release, is void because of the merger clause? No. Because it deals with employment. It isn't void, but it deals with employment issues, not personal issues. Well, if it says in the text of it, you know, it's between him and Nathani, an individual, and it's all loans and debts owed to him, why is it explicit in addressing personal debts? Well, it's between him and three entities also, two of which were... But they threw in Nathani, an individual. They did. Right? So any personal debts that are owed to Nathani as an individual are just covered by the text. Not really. Is that ambiguous? What's the ambiguity there? Well, I wouldn't say it's exactly ambiguous, but Nathani is covered as employer in the general release. Among the parties being released as employers is Nathani. And I'll give you one specific paragraph. It was paragraph six where they release officers and directors. So he's being released not as an individual, but as the president of both MedMed and Formal Spectrum. Right. In that document. In that document he's being released. That's correct. Yeah. But in this document, he's being released, as are the companies, as the borrowers, and Mr. Barchet is releasing them as the debtor. That's correct. But these went as signed together at the closing, contemporaneously. Okay. So it's the fact that they are signed at the same time is basically what you're hanging your hat on. One. That. Two. When you have a release in... Well, two in New York, based on the Court of Appeals rulings, you've got... When you're releasing a... Well, a seeker, it's got to be, quote, fairly and knowingly made for both known and unknown entries. Right. But that's not an... So even if... That's not an unknown. ... fraudulent inducement. Sorry. Do you make an argument that you were fraudulently... that he was fraudulently induced into signing the release? No. Fraud, I don't think, comes into play here. But do you think it's inoperative because he didn't know what he was signing? Is that the claim? No. It doesn't go as far as releasing. So what is the question about whether it's knowing and voluntary? You're saying we should consider his subjective thoughts to interpret what the words mean in the agreement? If you had it... No, because here you've got a clear document. The general release instructing everyone that it's employment-based. It doesn't go as far as mentioning anything personal. So they're going in terms... But actually, if we understand the release only in terms of what the general release covers, then aren't we just nullifying the release? I mean, isn't the fact that there was a release that's specific about employment mean that the other release must be doing something else? Not necessarily. No, because if the connect... These are not unconnected documents. Because again, when you've got a closing for a sale of a company and all the employees are being And also there's nothing in the record whereby he was knowingly told that a personal claim is being released. So we go to the ritualistic language of any claim... So I get your claim that he didn't understand the implications of the release, but you just said you're not saying that the release is unenforceable because he didn't know what he was signing or he was induced, misled into signing it. So if that's true and it's operative, I go back to just the text of it. It just covers debts owed to Mahesh Deithani, an individual. Right? And also the three entities. And the three entities. So we don't know... Again, when you've got three businesses, two of which employs him, the clear understanding to him on the date was... Him and the other employees, by the way. He's the only one who signed things like this. You've got all the employees coming in that day and signing the releases at the closing. No one told him, and by the way, the second release, the six lines, you're giving up a quarter of a million dollars for $1,100. I mean, that's way out of luck. Well, when the... You referred to the New York rule about applying special rules to very broad general releases. Are you aware of any New York appellate case that applied those special rules to hold that the release did not cover a known claim as opposed to unknown claims? Because this is a known claim. He knows that he has a claim for $250,000 or more. He does. But he pleads in his complaint that this was an expense reimbursement connected to his employment, the $1,800. Yeah, but the expenses are covered explicitly within the general release in the employment document. And which says... It says they cover all claims of employees, including expenses. It explicitly says including expenses. Right. And what it has for reimbursement is zero. And I think that's where the second release, the small release, comes in. Because in the general release... If you like, I'll give you the page. Exhibit A, expense reimbursement. It has the amount of zero. Oh, where is that? What page in the appendix? That's Exhibit A... If you like, I'll have to get the... I got it. It's A45. Okay. So you've got payback pay and then expense reimbursement. Zero. Got it. I see it. And that's why this comes into play. Because this is... And that's what's been played. This is where he gets his expenses back with this $1,100. And again, of the named entities, three are the LLCs. So if they weren't there, there might be a much better argument that he's released them for $1,100. When you've got three LLCs and the other general release and settlement agreement, the clear scope and the context of these documents concerns termination of employment. It has nothing to do with personal affairs. Weren't the payments that Mr. Barchet received from Naitani written on the account of one or more of those companies? It was only written on MedMay's account. Okay. He signed it and it has the word alone on it. And it totals $140,000. Right. So he's been working through his entity. And that we... The checks, copies of the checks are in the record. So it isn't something that we're, you know, we're speculating. That's there. Everything he was doing was basically through the entity with my client. You don't allege that you were under time pressure to sign, do you? Because the general release has, you know, 45 days and consult counsel provisions. We don't allege a judge because I think that's a more minor point. That he was never given the release 45 days prior, he wasn't. That's a known fact. And they don't raise that. And if you read Naitani's declaration, he says they both dated October 4th. So again, that supports it. And if you really want further proof, look at Naitani's lawyer letter from January of 2020, where he's seeking, what, $253,254,000 in a clawback or set-off. Which, again, the dating recites it's October 4th. So we're getting the October 10th date, and the district judge is treating it as a separate document. As a separate, what should I say, separate deal, so to speak, altogether. There's several layers that we've encountered here. One, he's not an employee. Two, the companies aren't even in business. What was the breakfast where Naitani, where they discussed the $250,000 debt? I'm sorry, what's that? What was the breakfast where they discussed the $250,000 debt? It was at the Four Seasons Hotel after the company was sold. Not where, I don't care where. Between October 4th and October 10th, does that date matter? I believe it was later than October 4th, from memory. So I don't think there's any connection with October 4th. Or the 10th, it doesn't matter. I mean, I think it was later than October 4th. I think it was at the end, towards the end of October 2019. It's in the record. We've got the email in the record. Okay, thanks. Can I ask a question? So why wouldn't any debt that Barchet owed to Naitani have been discharged in Naitani's bankruptcy? I'm sorry, again? Naitani went through a bankruptcy after he assumed this debt to Barchet, right? Yes, he filed in 2004. Yes, so why wouldn't a personal debt have been discharged in bankruptcy? Well, number one, he was never named in the petition. He was never said- But if he knew about it, wouldn't it have been your client's obligation to file something with the bankruptcy? No, because at the time, my client- You just knew that your client knew about the bankruptcy, right? Well, what my client believed when he heard about the bankruptcy was that it concerned a telecom company. They were in the phone card business at the time. And do you understand what I'm saying? Phone cards, where you'd buy a long-distance card and make telephone calls. He thought that the bankruptcy concerned a thing called an entity known as Ibex Telecom. So you're saying he wasn't on notice that Naitani was going through a bankruptcy? Not personally, no. Even though he set up this separate entity on his behalf during the bankruptcy? He set it up, yes. But he felt at the time that it was Ibex that went bankrupt, not Naitani as an individual. Okay. Okay, thank you, counsel. You've reserved a couple of minutes for questions. Mr. Ray. Good morning, Your Honors. May it please the Court. Josh Ray, appearing for the appellee, Mahesh Naitani. And with me is my colleague, Allen Louise Mowens. As Your Honors correctly identified, this case really begins and ends with the release. To quote from the release, it is between Yan Barshay, referred to as the lender, release and discharge the borrowers, which explicitly includes my client, Mr. Naitani, as an individual from any claims, liabilities, or obligations of the borrowers. New York law is clear that when this sort of release is present, the burden shifts to the defendant to raise an allegation that it was signed under a fraud or duress. As my colleague, Mr. Soros, just admitted, there is no such allegation here. And that really is the end of the matter, for all intents and purposes. This court has- Something's not right here. I mean, why would he release for $1,100 a $250,000 debt? According to my client, there was no $250,000 owed. As Mr. Soros just said, two payments had already been made to his client. From my client's perspective, that more than enough covered any alleged debt that was owed under the 2003 agreement. And as the district court found, at the time those payments were made, there actually was no valid contract in existence because 13 years had already gone by where no payment was made. So any payment that my client made was really just a matter of generosity. Yeah, why is it that it's only generosity? I mean, if he had had periodic conversations about it and they thought he kept saying that he's going to pay it back eventually, why is 13 years inherently unreasonable such that we should say that it's a breach? I mean, why wouldn't he have trusted, okay, it's accumulating interest and he's making money, and so I trust that he's going to pay it back to me eventually. Even if that is his subjective intent, the case law in New York is clear that when a date to perform is not specified in the agreement, it's a commercially reasonable time. And as the district court found, even if there was those sort of discussions happening, which we deny but it is alleged, the agreement 13 years is more than enough for it to have terminated at that time. Well, including after both of these were signed, apparently they discussed it at breakfast, and he acknowledged allegedly the existence of this debt. Allegedly, you're correct, but that still doesn't get rid of the clear language of the release. So any of this, even if we accept all this is true, the release, which was specifically entered into for Mr. Natani as an individual exactly to cover these sorts of issues and exactly to get the certainty that Mr. Barchet wouldn't be filing this sort of claim, it was meant as a global release to settle any personal issues they had over their long career together. And it's broad, as Mr. Soros admitted, it's unambiguous. Is it right that other employees of the company also signed identical releases? To be honest, Your Honor, I'm not sure if they were identical, but I am aware that they released Natani an individual. I don't know for a fact whether there were other personal releases signed by Natani and his employees. Okay. Well, we can make up the fact as alleged in the complaint that after all of this, after the closing, Barchet supposedly calls your client and demands the payment, and Natani never says, what are you talking about? You released that claim. There's no reference, no assertion of that. And instead, there comes to be this highly suspicious, oh, we overpaid, so actually there's an amount that you owe me, which is suspiciously close to the $250,000. Why is that the defense rather than you released that claim? Go away. It's a very good point, Your Honor. You'd have to ask my client that, to be honest. But I will say that in relation to the sale of this company to a private equity fund, there was actually an overpayment to all the equity holders of MedMeme, and so this wasn't specific to Mr. Barchet. There was an overpayment issue. My client's counsel at the time did pursue actions against several of the equity holders for overpayments that happened, and so it was really just a coincidence that the amount is roughly the same. Well, I mean, all of this is interesting, of course, and we're all speculating, but aren't these all the kind of factual issues that a court could resolve if there was an actual trial? Well, I don't believe that's necessary, Your Honor, and because based on the release itself, any subsequent communications between them is actually irrelevant. All we need to look at is the unambiguous language of the release. The reason this court has supported a strong policy in favor of enforcing these type of releases is exactly to give people certainty. So I think when an agreement is very clear, very unambiguous, that it is broad to release any claims between the two as individuals, there's just no need for a trial because that is really the case. You did the separate release that releases the personal claim in the context after he's told by the lawyers that none of this has to do with personal claims, you can't put the personal loan on the term sheet because we're doing a business deal, and he signs the release about business claims, then it's put in front of him this other release that talks about the three LLCs and then throws in Nathani individual, and if he's led to believe that it's all about just releasing his employer, why wasn't he fraudulently induced into signing a release if we think that the release actually covered the personal debt? I actually think the fact that there were two separate releases kind of undercuts that entire theory because clearly, as alleged, the general release was specifically for all employment-related matters. It was very specific as to that. Then we have a separate release. Why would that be necessary if everything related to the employment had already been resolved? The only reason that a separate release was needed was because The opposing counsel just pointed out the expense reimbursement that he got, the $1,000. So why is that a reason for the separate release? Because even if it was, the release is broad enough to encompass things beyond just the expense reimbursement. So even if that's correct, I understand that the language is broad enough to encompass it beyond, but if he was given the impression that it did not and was told that, why wouldn't it be that he didn't know what he was signing? With respect, Your Honor, that wasn't alleged, as he just confirmed. They aren't making a claim that he was fraudulently induced. Yeah, I know. So there's a question of pleading. But why don't you tell me, if he had pled it, would it be plausible? Yeah, look, if he had pled it, potentially that could satisfy the burden for them to plead some sort of fraudulent inducement. But even if we set aside the release, there's a totally independent ground on which the complaint should be dismissed. And that, as the district court found, is that even if we accept everything in the complaint is true, in 2018, the January 2018 alleged modification of the original oral agreement would require a completely new contract with new consideration. And at that time, my client didn't owe any money to Mr. Barchet. So there was no consideration to exchange. So even if we totally disregard the release, which I submit we shouldn't do. Even if it were true, even if the district court were right that 13 years is not a reasonable time, although I expressed skepticism about that before, but even if we accept that, why couldn't the consideration be that Naithani still thought he owed a debt, even if it's a moral debt and maybe not a legally enforceable one, to Barchet? Why wouldn't we honor a contract that's formed in 2018? You potentially could, but again, I think the facts as alleged don't support that theory. Why not? Because they're not alleging that there was a new agreement made at that point. It wasn't in writing. He doesn't think it was a new agreement, but if you accept the district court's theory that there had been a breach before 2018, maybe it was a new agreement. And so I'm saying if it were, why wouldn't we just honor that agreement? Yeah, you could go against that, but then I think if you're going to take that attack, then I think we have to look at the release, and then it clearly covers what happened in 2013. So I was questioning about the release, and then you said, well, even if you put aside the release, there's this other argument, and then I said, well, what about this? And you said, well, there's the release. Fair point. From our perspective, we think that the district court was correct in applying New York law, saying that the original oral agreement was terminated well before 2016 and certainly before 2018. Can I ask, so what about the bankruptcy? Was the personal debt discharged in Mr. Naithani's bankruptcy? Yes, it was. So that's a separate reason. We didn't raise it in the brief, but, yes, that's a title. Well, opposing counsel just said that he didn't know that Naithani was going through a bankruptcy, and so therefore he didn't know that he needed to file anything with the bankruptcy court. Is that right? I don't know if that's true or not. It's certainly not alleged. Naithani did not include this debt in the schedule of obligations in his bankruptcy, is my understanding. Correct, and Mr. Barchet didn't file a claim, and it was a personal bankruptcy as well as a bankruptcy of his company that I understand he went through back in 2009. Right, so who would have the obligation? I mean, if Barchet knew about it, wouldn't he have the obligation to file a claim? Yes. Can I ask one other totally unrelated factual question? You don't dispute as a matter of fact that the plaintiff is a resident of New York, right? Correct. Okay, because the second amended complaint mysteriously does not include that allegation, which appeared in the original complaint and the first amended complaint, which says explicitly that the plaintiff is from New York, is a resident and domiciliary of New York, and then says the defendant moved to California, which generously could be construed as saying he's now domiciled in California. The latter is still in the second amended complaint. The former is not, but there's plenty of facts in the record that suggest that the plaintiff is from New York, so you're not disputing that fact? Correct. Okay, so then there is a diversity jurisdiction. Correct. Yes. Okay, thank you, Counsel. Thank you. In Mr. Nathan's email, December 18th, 2019, where he makes a statement at this point in time to the effect, you owe me more than I owe you, and he has the amount of $250,000 in his email. So it isn't as though he doesn't know what's at play. He knows exactly what's at play, because I've been going back and forth on this. Now, the issue of whether or not there was a reasonable time for the agreement, it's a question of fact. But if nothing else, Nathani certainly reaffirmed the debt twice, both in 2016 and 2018. And also I can- Why does that matter that he reaffirmed the debt twice if New York law actually says that when there's no time for repayment specified, it has to be a commercially reasonable period of time? Because I think this actually shows that there was a new promise to pay. Every time he reaffirmed the debt, there was a new promise to pay? Well, it shows if he's making partial payments, it shows, number one, he's reaffirming the agreement. Isn't that correct, I believe? I mean, he's been reaffirming- Well, he's acknowledging the existence of it, but that doesn't mean that there isn't inferred in the original agreement timeline by which he needs to pay. And if he hasn't completed it by that deadline, then there's a breach, right? I mean, I guess I could ask in a different way. I mean, why did Barchet sit on the debt for all of this time, from 2003 to 2018? Why didn't he sue during that time? Why didn't he insist on setting a deadline? Why didn't he do anything about the debt for all of that period? Because they were working together in these entities, and he was a senior executive, and he was doing well. He didn't want to jeopardize, obviously, his employment. At the same time, Nathani was making ongoing promises to pay him. First promise was he was going to get paid when, quote, the company made money. Second, and the one that we're dealing with now, is when the company was sold. And that was on October 4, 2019. So that's what triggered the dispute. So given those circumstances, do you think that 13 years is a commercially reasonable period of time to expect a repayment? Well, it depends on case-by-case basis, Judge. It depends on the situation. I suppose it's also not 13 years that we're looking at, right? And we have to figure out what would be a reasonable time for the debt to become due. And then you add to that some limitations period because he doesn't lose his rights because there wasn't repayment in a reasonable time. The first step would be if he hasn't made a payment in a reasonable time, you get to come to court and sue him and say, he owes me this money and a reasonable time has passed, and so he should have paid by now. And he didn't do that. So the question is, he has a limitations period after the last date at which it would have been reasonable for him to expect payment. I understand. It's a very vague amount here. It's not just 13 years. What is the statute of limitations for contract claims in New York? Six years. Six years. So it's seven years, really. If seven years was a reasonable time and he didn't act within six years after that time expired, then he would lose his rights. But if he had sued at year nine and seven years would have been a commercially reasonable time for the debt to become due, I take it he would have been perfectly entitled to file that suit because he would have been within the limitations period for filing a suit on a debt which became due seven years after it was made, assuming that seven years, let's say, is a commercially reasonable time to expect payment. I think one explanation, and I think it's a very strong explanation, is that when you have two people working together in a close corporation, there's a close bond. And they're working diligently, of course, and at the end of the day— And there are periodic discussions of the fact that he is going to pay, including, according to your client, an express agreement that he's going to pay once this deal goes through. That's right. And also, there was never any kind of memorandum or claim, you know, that times are the essence. But you've got to look now also at the sale of the company. The reported sale of the company was for $100 million. So your view, when did Naithani breach the original loan agreement he had with Barchet? When did he breach it? Yeah. The district court has a view, but so what's your view? November 15th breach. It's in the second amendment complaint because he had time from October 4th to get paid. In other words, $100 million by the time they would have sussed out all the payments to the entities. So the original loan agreement was operative up until the sale of the company and then a reasonable time thereafter to repay it. Give or take five weeks. And he repudiated on December 18th where he's giving the claims of set-off and the like. You owe me more than I owe you. He's making up these trumped-up charges. But by November 15th, I think that's a commercially reasonable time after the October 4th closing for Barchet to have been paid in full. And the closing makes a difference because they agreed on that in 2018 and that modified the agreement? That's correct. That's correct. And also, not only that, on May 3rd, excuse me, yes, May 3rd, 2019, pre-closing, when they met at the offices of MedMed and Barchet spoke to Naithani's lawyer. And he told her, please put my debt, the $250,000 on the closing sheet. She went back to him and came back to Barchet. According to Barchet now, it's in the complaint. And said, no, we can't do that because it's an individual claim, which will get paid when the deal closes. And he's prepared, of course, to take the stand and testify to it. And he'll bring in people like the accountant, too, to testify to it. So we've got, you know, the facts are there that there was an agreement that he intended to pay. And he made every indication to Barchet that he was going to pay. But unfortunately, he's come up short. And that's why we have to take your time. And also, one final point on the issue of innovation. And I say because Judge Park is in front of me. One case that we rely on, Judge, is your case of, regarding payment, of what is it? Bainbridge Fund versus the Republic of Argentina? 2022?  I don't remember that one. All right. We hold it. When there's a modification of agreement, it's a new promise to pay. And the ruling quotes Williston and Corbin. But on that happy note- I'm sorry, what difference does that make? I'm sorry? What difference does that make? What difference does that make? Because it's not an ovation. It's not an ovation? It's not an ovation. But why would it matter if it was a reinvigoration of the original agreement or was a modification of the original agreement? Because the trial judge found an ovation. An ovation in New York, in New York courts, in New York law, is not favored. That's where I raise the point. The trial judge says there was an ovation. I'm saying no. There was a new promise to pay. Big difference between one and the other. An ovation means a new agreement. No evidence in the record of a new agreement. Same parties, same facts, just a different date. Well, the district judge, because he found that there had been an earlier breach, he said it would have to be an ovation. That's where he gets to that. You're just saying there wasn't that earlier breach, and so therefore you wouldn't need it to be an ovation. So you don't even get to that point in your argument, do you? But you think it's erroneous. I get why. Okay. I understand the argument. Thank you, counsel. Thank you both. We'll take the case under advisement.